| | | |
|---|---|---|
| DAVE BRAINARD, an individual, | ) | |
| JUSTIN FAGERHAUG pka DUSTIN | ) | |
| EVANS, an individual, and TIM | ) | Case No. 3:07-0929 |
| MATTHEWS, an individual, | ) | Judge Trauger |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHIL VASSAR, an individual, CRAIG | ) | |
| WISEMAN, an individual, | ) | |
| PHYLVESTER MUSIC, INC., a | ) | |
| Tennessee Corporation, BIG LOUD | ) | |
| SHIRT INDUSTRIES, L.L.C., a | ) | |
| Tennessee Limited Liability Company, | ) | |
| SONY BMG MUSIC | ) | |
| ENTERTAINMENT INC., including its | ) | |
| divisions RCA LABEL GROUP and | ) | |
| ARISTA NASHVILLE, a Delaware | ) | |
| Corporation, and PROCTER & | ) | |
| GAMBLE COMPANY, an Ohio | ) | |
| Corporation, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Defendants Phil Vassar, Craig Wiseman, Phylvester Music Inc., Big Loud Shirt

Industries, LLC and BMG Music[1] have filed a Motion to Dismiss Counts 2, 4, 5, 6, 7 and 8 of

the Plaintiffs' Complaint (Docket No. 24), to which the plaintiffs have responded (Docket No.

30), and the defendants have replied (Docket No. 32). For the reasons discussed herein, the

---

[1]The defendants allege that BMG Music has been incorrectly named as "Sony BMG
Music Entertainment Inc., including its divisions RCA Label Group and Arista Nashville, a
Delaware Corporation." (Docket No. 25 at p. 1)

1

defendants' Motion to Dismiss will be granted in part and denied in part.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In October 2003, Plaintiffs Dave Brainard, Dustin Evans, and Tim Matthews collaborated on a musical composition titled "Good Ol' Days to Come."[2] The plaintiffs recorded a demo version of the song in January 2004, featuring Dustin Evans on the vocals. Several days later, on January 22, 2004, the plaintiffs' representatives began pitching "Good Ol' Days to Come" to various recording artists and representatives of recording artists. The plaintiffs sought a nationally prominent singer to record "Good Ol' Days to Come" for commercial purposes.

On February 6, 2004, the demo of "Good Ol' Days to Come" was pitched to representatives of defendant Phil Vassar, a professional singer and songwriter. The plaintiffs allege that this pitch was made with the implied understanding, according to standard industry practice, that no use would be made of the song absent agreement of the plaintiffs, which would include compensation and song-writing credit. The plaintiffs allege that the demo was subsequently heard by Mr. Vassar himself, and/or Craig Wiseman, a professional songwriter, and that, later, representatives of defendant Sony BMG also listened to "Good Ol' Days to Come."

On February 11, 2004, representatives of Sony BMG told the plaintiffs' representatives that Mr. Vassar had decided not to record "Good Ol' Days to Come." Subsequently, in July, 2004, Mr. Evans recorded the song on an album also titled "Good Ol' Days to Come." A second

[2]Unless otherwise noted, the facts have been drawn from the plaintiffs' Complaint (Docket No. 1), in accordance with the court's task on a motion to dismiss to determine whether "[t]he factual allegations, assumed to be true . . . show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, No. 03-5306, 2007 U.S. App. LEXIS 20556, at *6 (6th Cir. Aug. 28, 2007).

2

authorized version of the plaintiffs' song, titled "Good Ol' Days," was recorded by an artist named Big Glenn Cummings on his debut album, titled "Big Glenn Cummings." A copyright of this version of the song was registered on March 24, 2005.

Sometime in late 2004, the plaintiffs learned that Mr. Vassar had recorded a song titled "Good Ole Days" as a part of his third album, "Shaken, Not Stirred," which was commercially released by Sony BMG on September 28, 2004. The "Good Ole Days" song was also released by Sony BMG as a "single" recording in June 2005. Since that time it has received widespread public performance in the form of radio air-play and through online music services such as iTunes, Yahoo Music, and AOL Music. "Good Ole Days" has also been synchronized as a part of a music video, which has itself received widespread public performance on television and through the online music services named above.

"Good Ole Days" has also been used by defendant Proctor & Gamble Company in its commercials for Prilosec OTC, a heartburn medication, and, according to the plaintiffs, in other forms of cross-promotional sponsorship involving Prilosec OTC. Mr. Vassar has publicly performed "Good Ole Days" in his live performances, including appearances on The Tonight Show and Fox Network's 2005 New Year's Eve coverage. Finally, "Good Ole Days" has been reproduced and distributed for sale in the form of a ring-tone for cellular phones. The plaintiffs allege that "Good Ole Days" is an unauthorized derivative work, based on "Good Ol' Days to Come," and that the substantial similarity between the two works includes portions of music and lyrics, overall theme, mood, pace, and total concept and feel.

On September 17, 2007, the plaintiffs filed this action, alleging: (1) copyright infringement, (2) common law misappropriation in violation of the plaintiffs' rights under the

Copyright Act, 17 U.S.C. § 101 *et seq.*, (3) breach of confidential relationship, (4) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125, (5) unfair competition in violation of Tennessee common law, (6) unjust enrichment, (7) constructive trust, and (8) accounting. (Docket No. 1) On December 7, 2007, defendants Phil Vassar, Craig Wiseman, Phylvester Music Inc., Big Loud Shirt Industries, LLC and BMG Music moved to dismiss counts 2, 4, 5, 6, 7 and 8 as preempted under the Copyright Act. (Docket No. 24).

## ANALYSIS

### I.    Motion to Dismiss Standard

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will accept as true the facts as the plaintiffs have pleaded them. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002); *Performance Contracting, Inc. v. Seaboard Sur. Co.*, 163 F.3d 366, 369 (6th Cir. 1998). The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "Indeed it may appear on the face of the pleadings that recovery is very remote and unlikely but that is not the test." *Scheuer*, 416 U.S. at 236. Rather, challenges to the merits of a plaintiff's claim should be "dealt with through summary judgment under Rule 56." *Swierkiewicz*, 534 U.S. at 514.

In *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955, 1964-65 (2007), the

4

Supreme Court readdressed the pleading requirements under the federal rules. The Court stressed that, although a complaint need not plead "detailed factual allegations," those allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 1964-65. "The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, No. 03-5306, 2007 U.S. App. LEXIS 20556, at *6 (6th Cir. Aug. 28, 2007) (citing *Twombly*, 127 S.Ct. at 1965). Further, the Court observed that Federal Rule of Civil Procedure 8(a)(2) does require a "showing" that the plaintiff is entitled to relief and that this substantive threshold is not achieved by conclusory assertions. *Twombly*, 127 S.Ct. at 1965 n.3.

Although Federal Rule of Civil Procedure 8 establishes a "liberal system of notice pleading," *see E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Accordingly, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965; *see also Swierkiewicz,* 534 U.S. at 508 n.1; *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer,* 416 U.S. at 236 (a well-pleaded complaint may proceed, even if it appears "that a recovery is very remote and unlikely"). With this standard in mind, the court turns to an analysis of the defendants'

motion to dismiss.

## II.    Copyright Act Preemption

Section 301 of the Copyright Act broadly preempts state law claims, stating:

[A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in § 106 in works of authorship that . . . come within the subject matter of copyright . . . are governed exclusively by this title . . . . [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).  The Sixth Circuit has held that, "under § 301, a state common law or statutory claim is preempted if: (1) the work is within the scope of the 'subject matter of copyright,' as specified in 17 U.S.C. §§ 102, 103; and, (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106."  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001); *see also ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 713 (6th Cir. 2005).  "These requirements are often referred to as the 'subject matter requirement' and the 'general scope' or 'equivalency' requirement."  *Stromback v. New Line Cinema*, 384 F.3d 283, 300 (6th Cir. 2004) (citing *Wrench*, 256 F.3d at 453); *see also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997).

### A.    Subject Matter Requirement

The Subject Matter Requirement "is satisfied if a work fits within the general subject matter of Sections 102 and 103 of the Copyright Act, regardless of whether it qualifies for copyright protection."  *Stromback*, 384 F.3d at 300 (citing *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 676 (7th Cir. 1986)).  For purposes of this analysis, "the scope of the Copyright Act's subject matter is broader than the scope of its

6

protection." *Id.* (citing *Wrench*, 256 F.3d at 454-55). So long as "a work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify, or because it has fallen into the public domain." *ATC Distribution Group., Inc.*, 402 F.3d at 713 (quoting *Nat'l Basketball Ass'n*, 105 F.3d at 849); *see also ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1452 (7th Cir. 1996) ("One function of § 301(a) is to prevent states from giving special protection to works of authorship that Congress has decided should be in the public domain, which it can accomplish only if 'subject matter of copyright' includes all works of a type covered by sections 102 and 103, even if federal law does not afford protection to them.").

The plaintiff's state law claims all arise from the defendants' alleged copying of the plaintiff's musical work, "Good Ol' Days to Come." Because "musical works, including any accompanying works," is included as a category of "works of authorship," under § 102(a) of the Copyright Act, "Good Ol' Days to Come" fits within the general subject matter of the Act. Accordingly, each of the plaintiff's state law claims meets the "subject matter requirement" for preemption.

## B.   Equivalency Requirement

The second step of analysis—the "general scope" or "equivalency" requirement—asks whether "the state common law or statutory action at issue asserts rights that are the same as those protected under § 106 of the Copyright Act[3]." *Wrench LLC*, 256 F.3d at 455.

---

[3]Section 106, titled "Exclusive rights in copyrighted works," provides:
Subject to sections 107 through 121, the owner of copyright under this title has exclusive rights to do and to authorize any of the following:

Case 3:07-cv-00929   Document 46   Filed 06/12/08   Page 7 of 24 PageID #: 192

"Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights" set forth in § 106. *Id*. at 456 (citing *Harper & Rowe Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 199-200 (2d Cir. 1983). To determine whether an act abridging the state right would necessarily infringe upon a right protected by the Copyright Act, the Sixth Circuit has adopted the "extra element" test. Under this test, "if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim." *Id*. (citing *Harper & Rowe*, 723 F.2d at 199-200); *see also ATC Distribution Group., Inc.*, 402 F.3d at 713. "The existence of an extra element precludes preemption only where the element changes the nature, rather than the scope, of the action." *Stromback*, 384 F.3d at 301.

In addition to examining the elements of the causes of action in question, "a court may be required to review the facts as pled by the plaintiff in order to determine whether the acts giving

---

(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted works;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.

8

rise to the state law claim are merely acts of copyright infringement." *Id.* (citing *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1304 (D.C. Cir. 2002) ("To determine whether a state law claim is qualitatively different from a copyright claim—that is, whether the state claim has an 'extra element'—courts generally examine both the elements of the state law cause of action and the way the plaintiff has actually pled that cause of action.").

A showing that the copyright infringement claim requires an extra element that the state law claim does not require will not defeat preemption; it is the state law claim that must include the extra element. In other words, equivalency exists where the state law cause of action is simply broader than the cause of action created by the Copyright Act. *See ATC Distribution Group*., 402 F.3d at 713 ("The fact that none of these works are eligible for copyright protection under federal law does not preclude the preemption of [the plaintiff's] state law claims."). In addition, under the "qualitatively different" requirement, "equivalency" may still exist where the extra element simply renders the state law claim narrower than the copyright infringement claim, without changing the nature of that claim. *See Stromback*, 384 F.3d at 301 ("[A]n extra element precludes preemption only where the element changes the nature, rather than the scope, of the action.") (citing *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1165 ("[A]n action is equivalent in substance to a copyright infringement claim where the additional elements merely concern *the extent to which* authors and their licensees can prohibit unauthorized copying by third parties.") (emphasis in original)). A state law cause of action is not "equivalent" if it (1) contains an extra element that (2) qualitatively changes the nature of the cause of action in comparison to a copyright infringement claim. *Wrench LLC*, 256 F.3d at 455-

9

56.[4]

## 1. Common Law Misappropriation

In *Stromback*, the Sixth Circuit held that misappropriation claims based on the copying of portions of a creative work "are preempted by the Copyright Act because they allege an act that infringes upon one of the exclusive rights set forth in Section 106." 384 F.3d at 302 (citing *Daboub v. Gibbons*, 42 F.3d 285, 289 (5th Cir. 1995) (misappropriation claim alleging "the wrongful copying, distribution, and performance of . . . lyrics" was preempted because it did not include an extra element qualitatively changing the claim)); *see also* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.01[B][1][f][iii] ("Except for a few stray rulings, legions of cases . . . have held preempted claims for misappropriation.") (citations omitted). The Court in *Stromback* also recognized that "a misappropriation claim will survive preemption if it alleges an extra element, such as a confidential or fiduciary relationship;" however, the Court ultimately found that no such element had been pled and that the claim was preempted. *Id*.

The plaintiffs propose that the breach of an implied promise to pay for the use of the plaintiffs' song and to credit the plaintiffs as creators of the song are sufficient "extra elements" to defeat preemption. However, as the defendants point out, the source for the implied promises to pay and to provide credit is not, under the plaintiffs' allegations, any behavior on behalf of the parties but, rather, standard industry practice. The law that underpins this practice is the law of

---

[4]In *Ritchie v. Williams*, 395 F.3d 283, 288 (6th Cir. 2005), the Sixth Circuit expressed some frustration with the "extra element" analysis, quoting commentary that had found "[i]n all but the simplest cases, the extra elements test cannot be applied with any certainty." (quoting Marshall A. Leaffer, Understanding Copyright Law § 11.7[C] (3d ed. 1999)). The Sixth Circuit did not, however, adopt a different test in *Ritchie,* instead affirming the district court's application of the equivalency test. *Id*. at 287-88.

10

copyright. In fact, it is the Copyright Act that creates causes of action where derivative works are created from original songs without the consent of the original authors. *See* 17 U.S.C. § 106.

The rights created by the Copyright Act cannot provide the underlying basis for an "extra element" beyond the scope of the Act itself. The essence of the plaintiffs' misappropriation claim is that the defendants created a derivative work from the plaintiffs' song without the plaintiffs' permission. An implied promise to not break the law of copyright cannot qualitatively change the nature of the plaintiffs' cause of action.

In *Wrench*, the Sixth Circuit held that an implied-in-fact contract claim was not preempted by the Copyright Act because it included the extra element of "the promise to pay" which "does change the nature of the action so that it is qualitatively different from a copyright infringement claim." 256 F.3d at 456. This "qualitative difference" included "the requirement of proof of an enforceable promise and a breach thereof which requires, inter alia, proof of mutual assent and consideration, as well as proof of the value of the work and appellee's use thereof." *Id*. The plaintiffs in *Wrench*, unlike the plaintiffs in this case, alleged facts indicating that an implied promise to pay actually existed. *Wrench* involved numerous face-to-face negotiations occurring over the course of one year and a draft licensing agreement, including a specific payment structure, that the defendants did not reject. *Id*. at 449-52. In the case at hand, the plaintiffs allege only that, in accordance with industry practice, the parties understood that use would not be made of the plaintiffs' song unless an agreement was later reached. Essentially, the plaintiffs allege an implied promise to later make a promise under certain conditions or, put differently, an implied promise not to break the copyright laws.

The Court in *Wrench* was careful to distinguish the implied-in-fact promise in that case

Case 3:07-cv-00929   Document 46   Filed 06/12/08   Page 11 of 24 PageID #: 196

from the implied promise alleged by the plaintiffs in this case. The Court stated that "we do not embrace the proposition that all state law contract claims survive preemption simply because they involve the additional element of promise," because "[u]nder that rationale, a contract which consisted only of a promise not to reproduce the copyrighted work would survive preemption even though it was limited to one of the exclusive rights enumerated in 17 U.S.C. § 106." *Id.* at 457. Under *Wrench*, "[i]f the promise amounts only to a promise to refrain from reproducing, performing, distributing or displaying the work, then the contract claim is preempted." Id.; see also 1 Nimmer on Copyright § 1.01[B][1][a] at 1-22 ("[P]reemption should continue to strike down claims that, though denominated 'contract,' nonetheless complain directly about the reproduction of expressive materials.").

The difference between the plaintiffs' alleged promise and the promise in *Wrench* is essentially the difference between a contract implied in law, or a quasi-contract, and a contract implied in fact. Contracts implied in law "unlike true contracts, are not based upon the apparent intention of the parties to undertake the performance in question, nor are they promises." Instead they are "obligations created by law for reasons of justice." *Id.* at 458 (quoting *Nimmer on Copyright*, § 16.03 at 10-10). An allegation of a contract implied in law cannot defeat preemption because it "requires no extra element in addition to an act of reproduction, performance, distribution or display, whereas an action based on a contract implied in fact requires the extra element of a promise to pay for the use of the work which is implied from the conduct of the parties." *Id.* at 459.

Under Tennessee law, "a contract can be expressed, implied, written, or oral, but an enforceable contract must, among other elements, result from a meeting of the minds and must

12

be sufficiently definite to be enforced." *Jamestowne on Signal, Inc. v. First Federal Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. App. 1990) (citing *Johnson v. Central National Ins. Co. Of Omaha, Neb.*, 356 S.W.2d 277, 281 (Tenn. 1962); *Price v. Mercury Supply Co., Inc.*, 682 S.W.2d 924 (Tenn. App. 1984)). This "meeting of the minds" cannot be established "by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties . . . ." *Id.* (citing *Batson v. Pleasant View Utility Dist.*, 592 S.W.2d 578, 582 (Tenn. App. 1979); *Balderacchi v. Ruth*, 256 S.W.2d 390 (Tenn. 1953)). Under Tennessee law, the plaintiffs' allegations simply do not support the existence of an implied contract. Even if it could be shown that Tennessee recognized an implied promise not to create an unauthorized derivative work, that promise would not add an "extra element" to an action for copyright violation itself.

The plaintiffs have correctly noted that misappropriation of trade secrets claims often defeat preemption because trade secrets claims require the extra element of a "breach of duty of trust and confidentiality." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 218 (3d Cir. 2002). The breach of a duty of trust or confidence "is the gravamen of such trade secret claims, and supplies the 'extra element' that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying." *Computer Associates Intern., Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992). The plaintiffs' claims, however, do not involve trade secrets. Their claim is, in fact, "based solely on copying." *Id.*

Nevertheless, the plaintiffs have sought to analogize their misappropriation claim to trade secrets claims by alleging that their claim also involves "a breach of an implied duty of trust."

13

(Docket No. 30). The plaintiffs have identified no source in law for this implied duty, nor have

they shown this duty to be an element in misappropriation claims that do not involve trade

secrets. There are simply no factual allegations in the complaint indicating any special duty of

trust between the parties. Arguably, as with all persons, the defendants owed the plaintiffs the

common duties of care assigned by negligence law. In addition, it could be said that the

Copyright Act assigned the parties duties with regard to their creative work. These are duties

that apply to all persons. They are not "extra elements" that change the nature of the plaintiffs'

claims.[5] The plaintiffs' claim for misappropriation is preempted by the Copyright Act and will

be dismissed.

### 2. Unjust Enrichment

The plaintiffs' unjust enrichment claim, like its misappropriation claim, is in essence a

claim if an implied-in-law contract. The plaintiffs allege that the defendants "obtained benefits

as a result of improperly using Plaintiffs' rights and property, which Defendants were not

---

[5]In addition, the plaintiffs cite the Second Circuit's opinion in *NBA v. Motorola, Inc.*, 105 F.3d 841, 845 (2d Cir. 1997), for the proposition that their misappropriation claim is not preempted. *NBA* involved a body of law created by the New York courts addressing the practice in which news outlets had lifted factual stories from other outlets and rebroadcast them. *Id*. The court held that, "based on legislative history of the 1976 amendments" to the Copyright Act, claims arising from this body of law—called "hot-news" claims—survive preemption. *Id*. The plaintiffs have cited no case law indicating that the Tennessee courts have adopted New York's "hot-news" causes of action. The plaintiffs' misappropriation claim is also quite obviously not a "hot-news" claim. Among other elements, a "hot-news" claim requires a showing that "the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened." *Id*. This element is met when the underlying factual information at issue is not protected by the Copyright Act. *Id*. at 851. Where the underlying information is protected by copyright—such as the rebroadcast of an opera performance—no "hot news" claim can be alleged. *Id*. at 852. The content of the plaintiffs' song is protected by copyright, and a parallel "hot news" cause of action is not necessary to protect song-writers from free-riding.

14

authorized to use, and for which Defendants did not compensate Plaintiffs, and accordingly Defendants were unjustly enriched by the amount of monies they received and will continue to receive." (Docket No. 1, p. 14, ¶ 58)

This language does not add an element to the acts of reproduction, performance, distribution, or display that constitute the unauthorized use of the plaintiffs' work under federal copyright law. *See Murray Hill Publications, Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 638 (6th Cir. 2001). The plaintiffs allege that their unjust enrichment claim, like their claim for misappropriation, includes the extra elements of "breach of duty or trust" and the defendants' failure to compensate and credit the plaintiffs. As discussed above, these are not extra elements that change the underlying nature of the cause of action. There are simply no allegations indicating that any duty existed between the parties except those duties created by copyright protection itself. The plaintiffs do not allege a promise to pay. As the Sixth Circuit has stated, "[a] claim that one party was aware of the expectations of the other is a far cry from a claim that the first party agreed to a course of conduct that would fulfill those expectations." *Id.*; *see also Taco Bell*, 256 F.3d at 459; *Diamond v. Gillis*, 357 F. Supp. 2d 1003, 1009 (E.D. Mich 2005) ("[A]n action based on a contract implied in law requires no extra element in addition to an act of reproduction, performance, distribution or display . . . ."). The plaintiffs' unjust enrichment claim is preempted by the Copyright Act and will be dismissed.

### 3. Constructive Trust and Accounting

The plaintiffs' allegations supporting their claims for constructive trust and for accounting likewise fail to allege an extra element that changes the nature of these claims in comparison to a Copyright Act claim.

In support of their claim for constructive trust, the plaintiffs allege that the defendants "have engaged in acts and omissions in detriment to the possessory rights, title and interest" of the plaintiffs in their song" and that the defendants have been "unjustly enriched" at the expense of the plaintiffs by doing so. (Docket No. 1 at p. 15, ¶ 62, 63) In support of their claim for an accounting, the plaintiffs allege that, although the plaintiffs "were and are the owners of the copyright in the Infringing Work," the defendants "have received income from the copying, distribution, marketing and sale of the Infringing Work" and have failed to pay the plaintiffs for their use. (*Id.* at p. 16, ¶ 67, 68). These allegations do not go beyond the acts of reproduction, performance, distribution, or display that are subject to the Copyright Act.

In their response to the defendants' motion to dismiss, the plaintiffs allege the same proposed extra elements with regard to these causes of action as have been discussed above, namely, that the defendants' alleged copying of their song constituted a "breach of duty or trust" and that the defendants failed to pay or credit the plaintiffs. As with the causes of action discussed above, these allegations do not create "extra elements" for purposes of preemption.

### III. Unfair Competition under the Lanham Act

The Lanham Act prohibits the use of "any word, term, name, symbol or device, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ." Lanham Act, § 43(a)(1), 15 U.S.C. § 1125(a)(1). The plaintiffs allege that the defendants' creation of an unauthorized derivative work from the plaintiffs' song, without

providing payment or song-writing credit, violated the Lanham Act.

In *Dastar Corp. v. Twentieth Century Fox Film Co.*, 539 U.S. 23, 37 (2003), the Supreme Court held that § 43(a)(1) of the Lanham Act protected only "the producer of the tangible goods that are offered for sale, and not . . . the author of any idea, concept, or communication embodied in those goods." The Court reasoned that, "in construing the Lanham Act, we have been 'careful to caution against misuse or over-extension' of trademark and related protections into areas traditionally occupied by patent or copyright." *Id*. at 34 (quoting *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001)). That is because "[t]he Lanham Act . . . does not exist to reward manufacturers for their innovation in creating a particular device," *id*. (quoting *TrafFix*, 532 U.S. at 34), and "has no necessary relation to invention or discovery," *id*. (quoting *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879)), but instead, "by preventing competitors from copying 'a source-identifying mark . . . [the Lanham Act] reduce[s] the customer's costs of shopping and making purchasing decisions,' and 'helps assure a producer that it . . . will reap the financial, reputation-related rewards associated with a desirable product,'" *id*. (quoting *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 163-64 (1995)). Accordingly, the Court held that "origin of goods" in § 1125(a)(1) referred only to the origin of the physically produced item, and not the origin of the creative content in that item.

Under *Dastar*, the Lanham Act would provide a cause of action if the defendants had taken actual albums produced by the plaintiffs and labeled them as having been produced by the defendants, or if the defendants had labeled their own albums as having been produced by the plaintiffs when they were, in fact, produced by the defendants. *Id*. at 33-35. It does not, however, provide a cause of action in the present setting, where the plaintiffs allege that the

17

defendants stole portions of their song and recorded it themselves. *Id*. That is the realm of copyright. *Id*.

The plaintiffs have sought to distinguish *Dastar* on the grounds that it involved a creative work whose copyright had expired. *Dastar*, however, did not limit itself to situations of copyright expiration, but instead held that:

> In sum, reading the phrase "origin of goods" in the Lanham Act in accordance with the Act's common law foundations (which were *not* designed to protect originality or creativity), and in light of the copyright and patent laws (which *were*), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods. . . . To hold otherwise would be akin to finding that [the Lanham Act] created a species of perpetual patent and copyright, which Congress may not do.

*Id*. at 37 (emphasis in original) (internal citations omitted). The Court in *Dastar* did note that one of the practical difficulties of applying 15 U.S.C. § 1125(a)(1) to protect the author of the creative content, rather than producer of the tangible goods, was that it "would create a species of mutant copyright law that limits the public's 'federal right to copy and to use' expired copyrights." *Id*. at 34 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 41, 150-51 (1989)). It does not follow, however, that *Dastar* intended that "origin of goods" in § 1125(a)(1) should mean one thing when addressing copyrighted works, and mean something quite different when addressing works whose copyrights had expired. Quite to the contrary, the Court in *Dastar* set out to answer whether "origin of goods" could be applied to the origin of creative content in all settings, and found that it could not. *Id*. at 32 ("[A]s used in the Lanham Act, the phrase 'origin of goods' is in our view incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain."); *see also Williams v. UMG Recordings, Inc.*, 281 F. Supp. 2d 1177, 1185 (C.D. Cal. 2003) ("While the film footage at

18

issue in Dastar was not copyrighted at the time of distribution . . . , the Court's holding is in no way limited to uncopyrighted material.").

The federal courts have consistently applied *Dastar* to hold that "'origin of goods' in the Lanham Act § 43(a)(1)(A) [does] not refer to the author of any idea, concept, or communication embodied in a good, but to the producer of the tangible good itself" whether or not the work at issue's copyright has expired. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008)[6] ("Construing the Lanham Act to cover misrepresentations about copyright licensing status . . . would allow competitors engaged in the distribution of copyrightable materials to litigate the underlying copyright infringement when they have no standing to do so . . . under copyright law, and we decline to do so."); *see also Zyla v. Wadsworth, Div. of Thompson Corp.*, 360 F.3d 243, 251-52 (under *Dastar*, false designation claims protect only the producer of the goods, and not the author of the creative content); *General Universal Systems, Inc. v. Lee*, 379 F.3d 131, 149 (5th Cir. 2004) (holding that, under Dastar, "claims of false authorship and reverse passing off, when raised to protect an author's interest in the intellectual content of communicative products, were not actionable under § 43(a) and should instead be pursued under copyright law"); *JB Oxford & Co. v. First Tennessee Bank Nat'l Assoc.*, 427 F. Supp. 2d 784, 806-07 (M.D. Tenn. 2006) (holding that, under *Dastar*, the Lanham Act did not create a cause of action for copying the content in an advertisement for use in an another advertisement, so long as

---

[6]The plaintiffs have cited an earlier Ninth Circuit case, *Lamothe v. Atlantic Recording Corp.*, 847 F. 2d 1403, 1405-06 (9th Cir. 1988), for the proposition that the failure to credit authors for their work in creating musical compositions can violate the Lanham Act. *Lamothe* was decided before the Supreme Court's *Dastar* opinion and, assuming that it does, in fact, hold what the plaintiffs allege that it holds, it cannot survive *Dastar* or the Ninth Circuit's application of *Dastar* in *Sybersound Records, Inc.*, 517 F.3d at 1144.

19

there was no question that the defendants actually produced their own advertisement). The plaintiffs allege that these cases are all wrongly decided. However, the plaintiffs have provided no authority applying *Dastar* in any other way, and the court can find no rationale for doing so in this case.[7]

The holding of *Dastar* is quite simple: the Lanham Act protects the producers of goods from false or misleading attribution. The law of copyright—and, in other settings, patent law—protects the attribution of ideas and creative works. *Dastar*, 539 U.S. at 37. To extend the Lanham Act to protect the creator of the musical content, rather than the creator of the physical goods would, as the Court noted in *Dastar*, "cause[] the Lanham Act to conflict with the law of

---

[7]The plaintiffs allege that applying *Dastar* to copyrighted works "risks putting the United States in violation of its obligations under Article 6 *bis* of the Berne Convention." (Docket No. 30 at p. 18) The plaintiffs do not cite any specific contradictory language in the Berne Convention. Instead, the plaintiffs cite language from the legislative history of the Berne Implementation Act indicating that Congress, at that time, expected § 43(a) of the Lanham Act to provide a cause of action to mis-attributed authors. (*Id.* at p. 18-19) Article 6 *bis* of the Berne Convention provides that "[i]ndependently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation." Berne Convention for the Protection of Literary and Artistic Works, as amended September 28, 1979, art. 6 *bis*, 1886 WL 13983 (Trty.), also available at http://www.wipo.int/clea/docs_new/pdf/en/wo/wo001en.pdf. It is far from clear exactly how the language of Article 6 *bis* is achieved under the United States' intellectual property laws; however, it is also far from clear that the application of the Lanham Act to cases that fall more naturally under the Copyright Act would achieve this objective. This court is obligated to follow the directives of the Supreme Court, and in *Dastar*, the Supreme Court held that the Lanham Act does not apply to cases such as the plaintiffs'. More to the point, the plaintiffs' cause of action is not directly implicated by Article 6 *bis*. The plaintiffs do not allege that they transferred their economic rights in the work in question, and so the issue of whether, independently of those rights, they may nevertheless claim attribution is not relevant to this case. In fact, it is where the Copyright Act *does not* apply—due, for instance, to lapse of copyright—that the protections of Article 6 *bis* would be most called into question. That situation is more analogous to the one confronted by the Supreme Court in *Dastar* than the one confronted by this court. Yet, even in *Dastar*, the Supreme Court found that the Lanham Act could not provide a cause of action.

20

copyright, which addresses that subject specifically." *Id*. at 33.

The plaintiffs do not allege to have themselves produced items that have been incorrectly labeled by the defendants, and they do not claim that the defendants misled the public into believing that the plaintiffs produced items that were instead produced by the defendants. Instead, the plaintiffs allege that the defendants stole their idea for a song, presented in the form of a demo tape, repackaged that song under their own authorship, and sold it. Under *Dastar*, that is not a cause of action arising under the Lanham Act. The plaintiffs' Lanham Act claim will be dismissed.

## IV.    Unfair Competition under Tennessee Common Law

The plaintiffs have also alleged a cause of action for unfair competition under Tennessee common law. Citing *McDonalds Corp. v. Shop At Home, Inc.*, 82 F. Supp. 2d 801, 816 (M.D. Tenn. 2000), the defendants allege that dismissal of the Lanham Act claim mandates dismissal of the Tennessee unfair competition claims. In *McDonlads Corp*., the court stated that "[t]he same analysis that applies to the federal Lanham Act claims also applies to the state claims of unfair competition under Tennessee common law and of violations of the Tennessee Consumer Protection Act ('TCPA')." *Id*. The court in *McDonalds Corp.* was referring to a specific issue in that case, namely, the absence of a likelihood of confusion, an element required under both the Lanham Act and Tennessee law. *Id*. The language in *McDonalds Corp.* does not necessarily indicate that the tort of unfair competition under Tennessee common law is limited, in all aspects, to the scope of the Lanham Act. *McDonalds Corp.* does not address whether unfair competition claims can be based on the theft of creative content, as opposed to mislabeled products, the specific reason that the Lanham Act does not apply in this case.

21

In *Men of Measure Clothing, Inc., v. Men of Measure, Inc.*, 710 S.W.2d 43, 48 (Tenn. App. 1986), the Tennessee Court of Appeals, addressing the same "likelihood of confusion" issue as the *McDonalds Corp.* court, stated that "[t]here is nothing to suggest a divergence among federal law, Tennessee common law or general principles of trade-mark law with respect to the issues in the instant case" and noted that "the Lanham Act has usually been interpreted as an embodiment of the common law." Like *McDonalds Corp.*, however, *Men of Measure Clothing, Inc.* did not address the specific issue in this case, involving the application of the unfair competition tort to the theft of creative content. Moreover, *Men of Measure Clothing, Inc.*, was decided approximately 17 years before the Supreme Court's *Dastar* decision, at which time it was far from clear whether or not the Lanham Act could be applied to creative content claims.

Neither the plaintiffs nor the defendants have identified the actual legal basis for an unfair competition claim under Tennessee law. In *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1243 (6th Cir. 1997), recognizing that "Tennessee law regarding unfair competition is not well-developed" the Sixth Circuit identified the following three elements to this tort:

> A plaintiff must prove that: (1) the defendant engaged in conduct which "passed off" its organization or services as that of the plaintiff; (2) in engaging in such conduct, the defendant acted with an intent to deceive the public as to the source of services offered or authority of its organization; and (3) the public was actually confused or deceived as to the source of the services offered or authority of its organization.[8]

---

[8]There is some conflicting authority as to the scope of the third requirement. *See Men of Measure Clothing, Inc.*, 710 S.W.2d at 48 ("[I]t is not necessary to prove that the public has actually been deceived . . . . [i]t is the liability to deception and consequent injury which justifies the issuance of an injunction") (quoting *M.M. Newcomer Co. v. Newcomer's New Store*, 217 S.W. 822 (Tenn. 1919)). However, whether or not the third requirement requires "actual

*See also Ferrari S.P.A. Esercizio Fabriche Automobile E Corse v. Roberts*, 739 F. Supp. 1138, 1146 (E.D. Tenn. 1990), *aff'd*, 944 F.2d 1235 (6th Cir. 1991), *cert. denied*, 505 U.S. 1219 (1992).

There is nothing in the elements identified by the Sixth Circuit in *Sovereign Order of Saint John of Jerusalem* that would necessarily limit the scope of the Tennessee unfair competition tort to mislabeled products, excluding misattributed ideas. The Tennessee tort, unlike the Lanham Act, does not turn on the definition of "origin of goods." The closest analogue is the requirement that a plaintiff show "conduct which 'passed off' its organization and services as that of the plaintiff." *Sovereign Order of Saint John of Jerusalem, Inc.*, 119 F.3d at 1243. Creating a song can be said to be the "services" of a songwriter. A songwriter who takes the song of another and labels it as his or her own can be said to have exhibited "conduct which 'passed off' its . . . services as that of the plaintiff." *Id*. In the absence of any Tennessee authority addressing this issue, the court cannot hold that Tennessee's unfair competition tort tracks the *Dastar* decision, barring the plaintiffs' claim. Accordingly, the plaintiffs' claim for unfair competition under Tennessee law will not be dismissed.

---

confusion" or "a likelihood of confusion" does not directly bear on the issue in this case, which is whether Tennessee's unfair competition tort can apply to "passing off" musical content.

## **CONCLUSION**

For the reasons stated herein, the defendants' Motion to Dismiss Counts 2, 4, 5, 6, 7 and 8 of the Plaintiffs' Complaint will be granted in part and denied in part. Counts 2, 4, 6, 7, and 8 will be dismissed, while Count 5 will not be dismissed.

An appropriate order will enter.

_____

ALETA A. TRAUGER
United States District Judge

Case 3:07-cv-00929   Document 46   Filed 06/12/08   Page 24 of 24 PageID #: 209