# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

DAVE BRAINARD,     )
JUSTIN FAGERHAUG pka DUSTIN )
EVANS, and TIM      )  **Case No. 3:07-0929**
MATHEWS,       )  **Judge Trauger**
           )
  **Plaintiffs,**     )
           )
**v.**           )
           )
PHIL VASSAR, CRAIG    )
WISEMAN,       )
PHYLVESTER MUSIC, INC.,   )
BIG LOUD SHIRT INDUSTRIES,  )
L.L.C.,  BMG MUSIC,    )
and PROCTER &      )
GAMBLE COMPANY,    )
           )
  **Defendants.**     )

## MEMORANDUM

Motions are pending before the court in this copyright infringement case, in which most of the plaintiffs' claims have already been dismissed.  First, defendant Procter & Gamble Company ("P&G") independently moved for summary judgment on the plaintiffs' remaining claims.  (Docket No. 67.)  Next, all defendants, that is, Phil Vassar, Craig Wiseman, Phylvester Music, Inc. ("Phylvester"), Big Loud Shirt Industries, LLC ("BLS"), BMG Music ("BMG"), and P&G have also moved for summary judgment on the plaintiffs' remaining claims (the "all defendants" motion).  (Docket No. 71.)  Also, the defendants have moved to strike a declaration submitted by Glenn Cummings in support of the plaintiffs' response to the defendants' summary judgment motions.  (Docket No. 107.)  For the reasons discussed herein, the "all defendants" motion for summary judgment will be granted, and the remaining motions denied as moot.

1

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves two country music songs, which both contain the optimistic notion that the "good old days" are actually yet to come.[1]  The plaintiffs, Dave Brainard, Dustin Evans, and Tim Mathews, are professional songwriters who have, apparently, achieved a moderate level of success, with Evans apparently also achieving a relatively high level of success as a performer.  (Docket No. 1 at 3.)

Defendants Phil Vassar and Craig Wiseman are successful professional songwriters, and Vassar is a nationally known country music recording artist who has had substantial success in the industry.  (Docket No. 54 at 3.)  Defendant Phylvester is a music publishing company owned by Vassar.  (*Id.*)  Defendant BLS is a music publishing company owned by Wiseman.  (*Id.* at 3-4.)  Defendant BMG is a music company with whom Vassar was affiliated as a recording artist during the relevant time period.  (*Id.* at 3.)  Defendant P&G is a well-known, large national corporation that is involved in the sale of an abundant number of household products.

In October 2003, the plaintiffs collaborated on a musical composition titled "Good Ol' Days to Come."  (Docket No. 1 at 5.)  The plaintiffs recorded a demo version of the song in January 2004, featuring Dustin Evans on the vocals.  (*Id.*)  Beginning in January 2004, the plaintiffs began the process of pitching their song to various recording artists and representatives

---

[1] Because the respective statements of material facts do a poor job of actually recounting the relevant facts of this case, the court is drawing undisputed facts from the plaintiffs' Complaint and the defendants' answers.  The court is using the various affidavits and exhibits submitted in summary judgment briefing to discuss issues that remain in dispute.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

2

of recording artists. (*Id.*) Specifically, the plaintiffs retained Joshua King and Wayne Jackson of Courtyard Music (a music publishing company) to pitch their song to prominent recording artists and their representatives. (Docket No. 98 at 1.)

According to King, on February 6, 2004, he and Jackson met with Leslie Roberts of the Artists and Repertoire ("A&R") Department of RCA Nashville (a division of BMG) for the sole purpose of pitching "Good Ol' Days to Come." (*Id.*) King stated that, prior to the meeting, he was aware that defendant Vassar (who was affiliated with RCA Nashville/BMG at the time) "was due to go in to a recording studio within the next few days to record songs for his upcoming album, and [we] felt the [plaintiffs' song] ... would be a good song to pitch for [] Vassar." (*Id.*)

According to King, at the February 6 meeting, he and Jackson played the plaintiffs' song for Roberts, and this was the only song played at the meeting. (*Id.*) According to King, Roberts said she would "take a copy of the song for Phil Vassar" and, therefore, King left the meeting with the impression that Vassar would receive a copy of the plaintiffs' song. (*Id.*) King stated that he and Jackson "left the CD of the demo of [the plaintiffs' song] with Ms. Roberts for [the] purpose" of delivering the song to Vassar. (*Id.*) King further stated that, after the meeting with Roberts, he and Jackson went to the offices of Greg Hill, Vassar's manager, and left a copy of the plaintiffs' song (on CD) at the front desk of Hill's office, "to his attention, for the purpose of pitching the [plaintiffs'] song ... to Phil Vassar." (*Id.*)

King's "pitch log," which was produced in conjunction with Mathews' deposition, supports King's statements. The log (which is a written record of the pitches that King and Jackson made during the relevant time period) reflects that King pitched the plaintiffs' song, for

3

Vassar's use, to both Hill and Roberts on February 6, 2004 and that Roberts "kept" the song (as opposed to "passing" on the song). (Docket No. 81 Ex. 30 at 6.) There is no notation indicating whether Hill ever "kept" or "passed" on the plaintiffs' song. (*Id.*)

Roberts submitted an affidavit stating that she has "no recollection" of screening the plaintiffs' song. (Docket No. 77 at 2.) Roberts stated that she was not authorized to submit songs directly to recording artists such as Vassar, and she "did not exceed [her] authority." (*Id.*) Roberts was authorized to pass potentially viable songs along to her superiors at RCA Nashville, who would, in turn, pitch those songs to artists such as Vassar. (*Id.*) Roberts does not recall whether she passed the song along in this manner. (*Id.*)

Vassar's manager, Greg Hill, submitted an affidavit in which he stated that he had never heard the plaintiffs' song prior to this litigation, that he had no recollection of receiving the plaintiffs' song and that he "never provided [] Vassar with a copy of plaintiffs' composition." (Docket No. 75 at 1.) Likewise, Vassar and Wiseman submitted affidavits stating that they did not hear the plaintiffs' song during this time period and that they were not even aware of the plaintiffs' song prior to this litigation. (Docket Nos. 74 and 76.)

Subsequently, in July 2004, Evans recorded the plaintiffs' song on an album also titled "Good Ol' Days to Come." (Docket No. 1 at 6.) A second authorized version of the plaintiffs' song, titled "Good Ol' Days," was recorded by an artist named Big Glenn Cummings on his self-titled debut album; this version was released in October 2004. (*Id.*) A copyright of this version of the song was registered on March 24, 2005. (*Id.*)

In their affidavits, Wiseman and Vassar state that, in March 2004, during a joint writing session, they wrote a song called "Good Ole Days" ("the accused song"). (Docket Nos. 74 and

4

76.)  In September 2004, the accused song was released, by defendant BMG, on Vassar's "*Shaken, Not Stirred*" album.  (Docket No. 54 at 6.)  The accused song was successful, as it was released as a single, publicly performed by Vassar both in concert and on national television (in 2005, on NBC's "Tonight Show" and FOX's New Year's Eve special), and it was made into a country music video, a cell phone ringtone, and also made available to download through various commercial music download services.  (*Id*. at 6-8.)

Despite their similar titles, the two songs, recordings of which were provided to the court, sound different in many ways.  The plaintiffs' song has unremarkable musical interludes in the beginning, middle and end of the song, and it is sung with a typical, modern country drawl and limited vocal or instrumental embellishments.  The accused song, on the other hand, is significantly more "upbeat," and it has noticeable and unique vocal and instrumental embellishments throughout the song that might be characterized by the listener as "fun" or "toe-tapping."

The lyrics of the two songs are as follows, as those songs are performed on the CDs with which the court has been provided.[2]  First, the lyrics of the plaintiffs' song are shown as embodied on a 2004 demo recording.  Importantly, the ellipsis after the word "Hey" reflects that, as sung, the word "Hey" is carried on the singer's voice for an extended period of time.  Additionally, where the word "days" is in italics below, a similar effect is noticeable.

> Life seemed so easy back then; Had a lotta good laughs with a lotta of good friends;
> We'd load up the Chevy and spend the weekend; Kickin' back at the lake;
> That sun'd go down we'd head across the tracks; For bonfires, twelve packs;

---

[2] While the court was presented with CDs containing at least two versions of each song, the slight differences in the versions are not important for the purposes of the motions here.

You might say lookin' back; Those were the good old days (but)

*CHORUS:* Hey... the night's still young; And there's more where that came from; Hey ... here's to the good ol' days; The good ol' *days* to come; (*END CHORUS*)

We could spend all night just reminiscing; Bout the songs we were singin' the girls we were kissin';
But all of that stuff was just the beginning; So let's raise our glasses high;
To the places we ain't been and the things we haven't done; You've got to admit we've had a good run (but)

*CHORUS:* Hey... the night's still young; And there's more where that came from; Hey ... here's to the good ol' days; The good ol' *days* to come; (*END CHORUS*)

Life seemed so easy back then; but whoever said it's all gotta end?

*CHORUS:* Hey... the night's still young; And there's more where that came from; Hey ... here's to the good ol' days; The good ol' *days* to come; (*END CHORUS*)

*CHORUS:* Hey... the night's still young; And there's more where that came from; Hey ... here's to the good ol' days; The good ol' *days* to come; (*END CHORUS*)

The good ol' days to come.

(Docket No. 87 Ex. C.)

Following are the lyrics of the accused song, as embodied on the 2004 "*Shaken, Not Stirred*" album. Again, the ellipsis after the word "Hey" reflects that, as sung, the word "Hey" is carried on the singer's voice for an extended period of time. Again, where the word "days" is similarly carried on the voice, it is italicized.

I work my job all the way to the weekend; call on my buddies ask 'where you been';
Let's get together somewhere 7 o'clock; wanna pop a top, pop a top;
Wanna go wanna roll wanna rock and

*CHORUS:* Hey ... let's make some good 'ol *days*; hey ... let's make some good 'ol *days*; that's right let's make some good ol' days tonight (*END CHORUS*)

Hey Baby what's the chance you dancin' with me; been watching you all night,

6

like what I see;
That big 'ol moon is shining down from above; you know we're stirring up magic stuff; This could be the night we fall in love;

*CHORUS:* Hey ... let's make some good 'ol *days*; hey ... let's make some good 'ol *days*; that's right let's make some good ol' days tonight (*END CHORUS*)

Ice cold, wild free, night's young for you and me; let's do something that we'd never dare;
something we'll be talkin' about now; rockin' chair, rock, rock, rock baby rock on now

Hey ... let's make some good 'ol *days*;
Hey ... let's make some good 'ol *days*;
Hey ... let's make some good 'ol *days*;
Hey ... let's make some good 'ol *days*;
Hey ... let's make some good 'ol *days*;
Hey ... let's make some good 'ol *days*;

(Docket No. 87 Ex. E.)

In 2005, defendant P&G teamed with Vassar and his representatives in a cross-promotional campaign, in which the accused song was featured in a series of television commercials for P&G's product "Prilosec OTC," which is a heartburn medication. (Docket No. 101 at 3.) According to the version with which the court was provided, the thirty-second commercial opens with an approximately four-second, full volume excerpt of the chorus of the accused song ("Let's make some good ole days") set to images from a Vassar concert. (Docket No. 86 Ex. A.) The next twenty-three seconds of the commercial feature Vassar (in various poses and positions) pitching Prilosec OTC, while the chorus and musical embellishments of the accused song play, at a significantly reduced volume, in the background. (*Id.*) The final few seconds of the commercial do not use the accused song, and no portion of the verses of the accused song appears in the commercial. (Docket No. 101 at 3.)

7

The plaintiffs apparently learned of the accused song when it was in wide release in 2004 or 2005.  On September 17, 2007, the plaintiffs filed this action, alleging: (1) copyright infringement, (2) common law misappropriation, (3) breach of confidential relationship, (4) unfair competition in violation of the Lanham Act, (5) common law unfair competition, (6) unjust enrichment, (7) constructive trust, and (8) accounting.  (Docket No. 1.)  Through motion practice and various agreed orders, all counts, except counts one and five, have been dismissed against all defendants.  (Docket Nos. 47, 59 and 65.)  Further, on April 20, 2009, at his request, plaintiff Evans was dismissed from this case.  (Docket No. 108.)

## ANALYSIS

The plaintiffs claim that the defendants infringed their copyright in violation of federal copyright law embodied in 17 U.S.C. § 101, *et seq.* and that the defendants engaged in common law unfair competition.  The defendants have moved for summary judgment on the plaintiffs' claims.  Summary judgment for all defendants on all remaining claims is appropriate for the reasons discussed herein.

### I.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d

8

558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at

9

247-49).

## II.    Copyright Infringement

In moving for summary judgment, none of the defendants challenges the validity of the plaintiffs' copyright, and none of the defendants argues that, even if the accused song infringed on the plaintiffs' copyright, it would not be liable for copyright infringement. Rather, in their summary judgment brief, the defendants all argue that (1) Vassar did not have access to the plaintiffs' work and (2) the two songs are not substantially similar, as that term has been defined by the Sixth Circuit. As noted above, defendant P&G, in addition to joining with the other defendants, has filed its own motion for summary judgment, arguing that, because its use of the accused song was limited to the Prilosec OTC commercial, the plaintiffs' claim for copyright infringement is even less viable as to P&G, when the issue of "substantial similarity" is considered. For the reasons discussed below, it will not be necessary to reach P&G's argument, because all defendants are entitled to summary judgment based on the arguments in the "all defendants" motion.

### A.    The Sixth Circuit Standard For Copyright Infringement

As a general matter, in copyright infringement cases, summary judgment, particularly in favor of a defendant, is to be used "sparingly," because very close questions of fact are frequently involved. *Jones v. Blige*, 558 F.3d 485, 490 (6th Cir. 2009). That said, on a defendant's motion for summary judgment, the court should compare the two works at issue and should render summary judgment for the defendant if the trier of fact would not be permitted to find substantial similarity at trial. *Id.* Where, as here, there is no dispute as to whether the plaintiff owns the copyrighted creation, to succeed on a copyright infringement action, the

10

plaintiff must sufficiently show that the defendant copied the copyrighted creation. *Id.*

Frequently, as here, the plaintiff will be unable to put forth any "direct evidence" of copying; in this situation, the plaintiff is permitted to establish "an inference" of copying, by showing (1) that the defendant had "access" to the allegedly infringed work and (2) that there is a "substantial similarity between the two works at issue."[3] *Id.* at 490-91.

Access occurs when the defendant either hears or has a "reasonable opportunity" to hear the plaintiff's work. *Id.* at 491. To establish "access" the plaintiff need not show that the defendant actually heard the plaintiff's work, but the plaintiff must show that the defendant "had an opportunity" to hear the work and copy it. *Id.* While access may not be "inferred through mere speculation or conjecture," "evidence that a third party with whom both the plaintiff and defendant were concurrently dealing had possession of plaintiff's work is sufficient to establish access." *Id.* (internal quotations omitted). In sum, the plaintiff must present a "reasonable possibility" that the defendant heard the plaintiff's work. *Id.*

The "substantial similarity" analysis involves two parts. First, the court is to "filter" out "the unprotectible aspects of the protected work." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 352 (6th Cir. 2004). That is, the court is to "filter out the unoriginal, unprotectible elements – elements that were not independently created by the inventor, and that possess no minimal degree of creativity ... ." *Stromback v. New Line Cinema*, 384 F.3d 283, 294 (6th Cir. 2004). The filtering process is to be conducted so that, when the filtering is over, the court is left with "only the expressive elements" of the protected work. *Id.*

-------

[3]Where two works are "strikingly similar," the Sixth Circuit permits a significantly reduced showing of access, but, here, there is no argument that these works are "strikingly similar." *Id.*

As applied by the Sixth Circuit, this filtering process is not particularly complicated. First, "ideas" are filtered out of the protected work; that is, because "copyright protection extends only to expression of ideas and not to ideas themselves," the ideas should be filtered out and not used in making the "substantial similarity" evaluation. *Id.* at 296. Next, "*scenes a faire*," that is, "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" are filtered out of the protected work because such *scenes a faire* are not afforded copyright protection either. *Id.* Finally, any other "common" or "stock" themes and usages are filtered out of the protected work and also not used for purposes of comparison. *Id.* at 297.

At this point, left with the core, expressive aspects of the work, the court investigates whether the works are "substantially similar." Substantial similarity exists when the relevant aspects of the accused work are so similar to the relevant aspects of the copyrighted work that an "ordinary reasonable person" would conclude that the defendant took "material of substance and value" from the copyrighted work and "unlawfully appropriated" it. *Id.* at 297 (internal quotations omitted). The fact that the defendant embellishes or adds to the work or changes it, even in significant ways, does not preclude a finding of infringement. Indeed, "the misappropriation of even a small portion of a copyrighted work may constitute infringement under certain circumstances. ... Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Id.* (internal quotation omitted). Bluntly stated, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Id.* (internal quotation omitted).

In sum, the substantial similarity test is based upon the "net impression" of the "ordinary

12

observer"; that is, on a motion for summary judgment by the defendant, after "casting aside" "stock themes, *scenes a faire*, and raw ideas," the court must decide whether a reasonable, ordinary juror could find, based on the "overall look and feel" of the relevant "constituent expressive elements," that the two works are substantially similar. *Id.* If so, summary judgment for the defendant is improper. *Id.*

## B. The Sixth Circuit Analysis Applied to the "All Defendants" Motion

As noted above, to survive summary judgment, the plaintiffs would have to sufficiently show that Vassar had "access" to their song and that the accused song is "substantially similar" to the plaintiffs' song. The court will consider each element in turn.

### 1. Access

The defendants largely focus on the fact that the plaintiffs have no direct evidence that Vassar listened to their song prior to March 2004 (when Vassar claims he created the accused song with Wiseman), and that Vassar and Wiseman deny ever having heard the plaintiffs' song prior to this litigation. (Docket No. 72 at 6-7.) They also attempt to negate the plaintiffs' two primary proposed "routes of access" for Vassar, which are, as discussed above in the factual section: (1) the fact that the plaintiffs' song was dropped off for Vassar's manager (Greg Hill) on February 6, 2004 and (2) the fact that the plaintiffs pitched the song, for Vassar's use, to Leslie Roberts, an A&R representative at Vassar's record label, RCA Nashville, the same day.

On this first "route of access," the defendants point to Hill's affidavit, which states that he does not remember receiving the plaintiffs' song and that he did not pass the song along to Vassar. (Docket No. 75.) The defendants further argue that Joshua King's pitch log "does not even evidence that a demo of plaintiffs' composition was given to Hill." (Docket No. 72 at 8.)

That may technically be correct, but the "pitch log" shows that, on February 6, 2004, the plaintiffs' song was "pitched," in some form, to Hill. There is no indication, however, as to whether Hill "passed on" or "kept" the song. (Docket No. 81 Ex. 30 at 6.)

On the second "route of access," the defendants, underwhelmingly, point out that Roberts does not remember the February 6, 2004 pitch and that the meeting between Roberts and King/Jackson does not establish that Vassar heard the song prior to the March 2004 writing session with Wiseman. (Docket No. 72 at 8-9.) The defendants argue that Roberts was not authorized to submit pitches directly to Vassar, but "would only have sent the demo to the label head of RCA/Nashville for his review." (Docket No. 72 at 9.) Even accepting Roberts' affidavit statement that she did not pitch the song directly to Vassar, the defendants offer little reliable evidence that Roberts did not forward the song to her superiors at RCA/Nashville, who were in the position to pitch directly to Vassar.[4]

In response, the plaintiffs point to the affidavit of Josh King, who, as discussed above, stated that (1) he and Jackson had a February 6, 2004 meeting with Roberts, for the sole purpose of pitching the plaintiffs' song for Vassar's use, and that the meeting ended with King believing that Vassar would receive a CD containing the plaintiffs' song and (2) he and Jackson left the meeting with Roberts and dropped off the plaintiffs' song on a CD at Hill's office. (Docket No.

---

[4]The defendants state that "BMG produced a document listing those third-party compositions that were forwarded by RCA/Nashville to Vassar for his consideration in recording the 2004 album *Shaken, Not Stirred*, and the plaintiffs' composition was not listed as one of the compositions forwarded to Vassar." (*Id.*) This document is simply a single piece of paper, with the title "2004 Phil Vassar Comps" and a series of songs listed under various dates. (Docket No. 84 Ex. 44.) There is no indication from the document as to when it was created or who created it. (*Id.*)

14

98.)  Summarizing both "routes of access," the plaintiffs' argue that "Roberts and Hill were both in positions that would have enabled them to provide Vassar with the demo of plaintiffs' composition prior to creation of the [accused work]. ... Both such individuals are closely connected to Vassar for the purpose of submitting songs for consideration."  (Docket No. 96 at 5-6.)

Ultimately, the plaintiffs' case for "access" is certainly not overwhelming, but it does not have to be to survive summary judgment.  The *Blige* case, which the court has repeatedly cited in this Memorandum, provides a helpful factual contrast.  In *Blige*, the access claim was solely based on the fact that the plaintiff had, at the invitation of a Mr. McKaie who worked in the A&R department of the "Universal" record label, submitted his song to Mr. McKaie.  558 F.3d at 488-89.  Universal, which is a very large record label, also happened to be the record label of the defendant Mary J. Blige, who was the vocalist on the allegedly infringing work.  *Id.*  The evidence also showed that someone at Universal (likely McKaie) had listened to the plaintiffs' song before deciding to "pass" on the song.   *Id.*   The Sixth Circuit found that there was no access as a matter of law, because there was no demonstrated connection between McKaie and the defendants (Blige and her associates) other than that they both had relationships with Universal.  *Id.* at 491.

The court implied, however, that it was only the weakness of the plaintiffs' argument in *Blige* that made summary judgment on the issue of access appropriate.  The court stated, "we are cautious of making it overly difficult for plaintiffs to establish access where the chain of possession of a work within a corporation is difficult to prove [but] Plaintiffs in this case have set forth no evidence tending to show a reasonable possibility that their work made its way from

15

McKaie" to the creators of the allegedly infringing work. *Id.* at 493. The court went on, "there is no evidence of the nature of [the defendants'] relationships with Universal employees that would support an inference that McKaie transferred Plaintiffs' song to [the defendants] through other intermediaries at Universal. As far as the record shows, [the defendants] were affiliated with McKaie only through an attenuated corporate connection, and to find a reasonable possibility of access, a jury would be required to make an implausible leap, unsupported by evidence other than bare corporate receipt." *Id.*

Here, the plaintiffs have clearly come forth with more evidence than the plaintiffs in *Blige*, as the plaintiffs here have established connections between the individuals who received the plaintiffs' demo and the allegedly infringing artist. Again, the plaintiffs' burden is not to show that Vassar absolutely heard the song or even that he absolutely had the opportunity to hear the song; rather, the plaintiffs' burden, at this stage, is to show, with all factual inferences drawn in their favor, that there is a genuine issue of material fact as to whether Vassar had a "reasonable opportunity" to hear the song. *Blige*, 558 F.3d at 491.

The plaintiffs have met this relatively low burden by showing that the plaintiffs' song was in the possession of Vassar's manager's office and Vassar's record label, and by showing that there was some indication that the record label was prepared to forward the song to Vassar. This evidence creates at least a fact issue as to access.

### 2. Substantial similarity

As the plaintiffs have sufficiently demonstrated access, the next question is whether there is a fact issue as to substantial similarity. As noted above, the first step in this analysis is to "filter" out the unprotectible aspects of the plaintiffs' work. Ideas are unprotectible, and,

therefore, the court does not consider, for purposes of comparison, the ideas contained in the plaintiffs' song, including the core idea that, despite the great times of the past, the "good old days" can actually be yet to come.

Further, all of the *scenes a faire*, that is, "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" are filtered out of the plaintiffs' song. Of course, this filters out much of the content of the plaintiffs' work. In any country song discussing the past and future "good old days," the subjects of drinking, socializing, and courting are clearly *scenes a faire*. Here, when these unprotected elements are removed, as a practical matter, what is left is the technical musical structure that underlies the lyrics and, also, the chorus of the song.

On the technical musical structure, there appears to be general agreement that the two songs are not particularly similar. While there are certain, basic musicological similarities between the two songs (for instance, similar or identical time, tempo, and length), the experts in this case essentially agree that these similarities are the result of common usage in the industry, and that they are not indicative of copying. (See Docket No. 79 Ex. 1 at 3.)

Indeed, the defendants put forth affidavits of their two experts, forensic musicologists Dan Dixon and Anthony Ricigliano, who both performed detailed analyses of the technical aspects of the songs, and who both concluded that the songs were not substantially similar. (See generally Docket No. 78 Ex. 1; Docket No. 79 Ex. 1.) For instance, Dixon opines that "a detailed comparison of the specific melodies, lyrics, chord progressions, formal designs, and accompaniment materials reveals that they are either clearly different, or where similarities exist, they result from the use in both works of commonplace musical devices that are generic to the

17

genre and style in which both works are performed. ... None of the similarities is substantial and there is no indication that protectible musical materials have been copied or misappropriated." (Docket No. 78 at 2.) The plaintiffs' expert, Dr. Gerald Eskelin, who is apparently a well-known and respected musicologist, pointed to a few technical similarities between the two songs, including that "the first and third phrases feature repeated syllables on scale step 5 leading to a final syllable on scale step 6." (Docket No. 81 Ex. 5 at 2.) But, as far as the court can tell, Dr. Eskelin does not point to any technical similarity that, in and of itself, would be indicative of copying.[5]

In light of all of this, to the extent that the plaintiffs have any claim of substantial similarity, it is found in the chorus of the two songs. Given the central importance of the choruses to the songs' commercial viability and value, sufficient similarity here could, potentially, demonstrate substantial similarity between the songs as a whole. *Stromback*, 384 F.3d at 297. As indicated above, there are similarities in the manner in which the core idea of the two songs (that the good old days are yet to come) is expressed in the chorus of both songs. That is, in both songs, on introducing that notion, there is a sustained "hey," followed, in short order, by either the phrase "here's to the good [old] days" in the plaintiffs' song and "let's make

_____

[5]Indeed, Dr. Eskelin was not a particularly helpful expert for the plaintiffs. For instance, he offered the opinion at his deposition that he did not believe the works were, as a whole, substantially similar. (Docket No. 81 Ex. 4 at 76.) Indeed, much of Dr. Eskelin's primary support for his position that the accused song was "derivative" of the plaintiffs' song (as opposed to being "substantially similar") was a "prior art search," in which Dr. Eskelin searched "iTunes" for songs with some variation of the phrase "Good Old Days" in the title, and, after listening to the songs located, he concluded that no other songs had "the combination of similar musical features" of the two songs at issue here, such as the sustained "Hey" at the start of the chorus. (Docket No. 81 Ex. 5 at 4.) As discussed herein, there is no question that there are unique similarities between the two songs here, but, on the whole, there is insufficient evidence of copying.

some good [old] days" in the accused song.  Also, in both songs, the word "days" is, like the word "hey," sustained on the singer's voice at various points in the chorus.

As Dr. Eskelin helpfully described the experience for the ordinary listener, "although the pitches are not identical in the first two measures, the general tessitura [range] and contour of these melodies combined with the sustained lyric 'Hey' followed by 'good old days' ... creates a distinctive similarity to the listener."  (Docket No. 81 Ex. 5 at 3.)  In his deposition, plaintiff Brainard commented that this apparent similarity came from the fact that, "it's building the tension in the same way, using the same elements, hey, hey, repeating good old days, good old days, good old days, tension, and then the release of it at the hook.  So it goes beyond just the simple twisting of good old days to come, [or] good old days tonight.  It is the way the whole thing is set up so that it is commercially – it hooks."  (Docket No. 81 Ex. 1 at  43-44.)

While the question is close, the court believes that, ultimately, a reasonable juror could not conclude that the songs are substantially similar based on this evidence.  As noted above, there are apparent similarities between the choruses of the two songs.  That said, there are at least three, readily apparent, distinct differences between the two choruses, which further undermine the plaintiffs' argument that a reasonable juror could conclude there was copying here.  First,  the overall tone of the choruses is (like the songs themselves) markedly different; that is, the plaintiffs' work strikes a hopeful, cautiously optimistic tone about the "good old days to come," but the accused work strikes a more certain, giddy tone about the "good old days" that will be enjoyed "tonight."

Second, in contrast to Brainard's argument, the choruses do not "build" or "release" "the tension" (in the artist's voice) in the chorus in the same way.  The plaintiffs' song builds the

"tension" or energy in the chorus throughout the chorus before finally releasing it on the words "to come" after the last, extended "days." The accused song releases any tension in the music on the words "that's right" in the middle of the chorus (also after the last extended "days"), not on the words "tonight," as might be indicative of copying. This creates a readily apparent distinction in the structure of the chorus and in the listening experience, as the "climaxes" of the choruses are reached in different places.

Finally, even the way the word "hey" is sung is different. That is, in the plaintiff's song, the word "hey" is simply sung in a extended manner, but, in the accused song, the word is embellished to sound more like "he-ay-ay-ay," which, again, creates a readily apparent distinction in the listening experience of the ordinary observer.

While the plaintiffs are not precluded from demonstrating substantial similarity based on the songs' choruses, given the undisputed, substantial differences between the songs in virtually every other relevant aspect, the plaintiffs would have to show remarkable identity between the choruses of the two songs in order to establish "substantial similarity" of the two works as a whole. While there are similarities between the choruses, they are, as discussed above, not sufficient for the plaintiffs to raise a fact issue on their "substantial similarity" claim.

Further, the other arguments that the plaintiffs offer in support of their substantial similarity claim are unavailing. The plaintiffs argue that the fact that the accused song was written only several weeks after King disseminated the plaintiffs' song and the fact that Vassar could not specifically recall writing the accused song both indicate copying. (Docket No. 96 at 17-18.) The first point, the timing of the accused song, goes to access, which the court already concluded was sufficiently established.

20

The second point does not indicate copying; it is not surprising or troubling that Vassar, in his February 27, 2009 deposition, could not recall the specific details of one writing session that took place almost five years in the past. Further, Vassar did not state that he could not remember the process of writing the accused song with Wiseman; rather he stated that the writing session with Wiseman in which the accused song was written was "probably" similar to the many other casual, informal and unremarkable writing sessions that Vassar and Wiseman have had throughout Vassar's career, in which the two get together and brainstorm ideas. (Docket No. 84 at 17.) For all the reasons discussed above, all defendants are entitled to summary judgment on the plaintiffs' copyright infringement claim.[6]

## III.    Unfair Competition

The plaintiffs' unfair competition claim is more clearly without merit. The parties agree that, in this case, to succeed on a claim of unfair competition under Tennessee law, the plaintiff would have to show that, among other things, the defendant "passed off" his work. *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1243 (6th Cir. 1997). The term "passed off" is usually used in the unfair competition context to describe a situation in which the

---

[6] The defendants have made their intention to move for attorneys' fees in this case well known to both the plaintiffs and the court. (*See e.g.* Docket No. 111.) Presumably, the defendants would move for these fees under Section 505 of the Copyright Act, which provides that "the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. While the court has discretion to award such fees to the prevailing party, those fees are only properly awarded to the defendants where the claim asserted is "frivolous," driven by improper motives, or "objectively unreasonable." *Fogerty*, 379 F.3d at 357. This was a close case brought by individual plaintiffs who, by all indications, strongly and earnestly believed that they had been wronged by more powerful interests. On this record, there is nothing to reflect that the plaintiffs' claims were "frivolous," driven by improper motives, or "objectively unreasonable." This does not appear to be an appropriate case for the award of attorneys' fees to the prevailing party.

defendants passed off their work as the work of the plaintiffs. *Id.* Here, there is obviously no evidence that any of the defendants attempted to pass off their work as actually being the work of the plaintiffs.

In support of their unfair competition claim, the plaintiffs state that "defendants did not take the entirety of the plaintiffs' song and call it their own. However, this does not mean that the defendants did not pass off parts of plaintiffs' composition as their own." (Docket No. 96 at 22.) This is, of course, the exact claim the plaintiffs' made in conjunction with their copyright infringement claim. Where the plaintiffs' common law or state law claim is based solely on rights granted by the Copyright Act, that claim is pre-empted by the Copyright Act. *Hamlin v. Trans-Dept. of Cal, Inc.*, 584 F. Supp. 1050, 1062 (M.D. Tenn. 2008). Therefore, to the extent that the plaintiffs' claim was based on "passing off" as described above (the defendants passed off their work as that of the plaintiffs) there is no evidence to support that claim, and to the extent that the plaintiffs' claim was based on "passing off" in the sense that the defendants used the plaintiffs' work as their own, that claim is pre-empted. Either way, the defendants are entitled to summary judgment on this claim. As the defendants are entitled to summary judgment on all of the plaintiffs' remaining claims, it is not necessary to address P&G's independent Motion for Summary Judgment, and that motion will be denied as moot.[7]

---

[7] The defendants' motion to strike the declaration of Glenn Cummings will also be denied as moot. The defendants objected to the declaration because, among other things, they claimed it contained the hearsay statements of various record industry employees who allegedly told Cummings that the plaintiffs' song had a "close similarity" to the accused song. (Docket No. 100 at 2.) Even if the court fully credited this declaration, the proposition that certain individuals thought that the two songs were similar in undefined and unexplained ways would not aid the plaintiffs' position on summary judgment, and, therefore, the court will deny the defendants' motion as moot.

Case 3:07-cv-00929   Document 114   Filed 04/29/09   Page 22 of 23 PageID #: 1472

## CONCLUSION

For the reasons discussed herein, the "all defendants" motion for summary judgment will

be granted, the remaining motions denied as moot, and this case will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

Case 3:07-cv-00929   Document 114   Filed 04/29/09   Page 23 of 23 PageID #: 1473